IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01802-RM-STV

THE ESTATE OF ROBERT VALLINA;
JUAN J. VALLINA, personally; and
MARTHA VALLINA, personally and as personal representative of the Estate of Robert Vallina, deceased;

    Plaintiffs,

v.

THE COUNTY OF TELLER SHERIFF'S OFFICE and its DETENTION FACILITY;
SHERIFF MIKE ENSMINGER, in his official capacity;
DEPUTY IAN CHRISTIANSEN, in his official capacity;
DEPUTY KEVIN JOHNSON, in his official capacity; and
JOHN/JANE DOES (1-20), in their respective individual and official capacities;

    Defendants.
_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

    This matter is before the Court on Plaintiff's Motion for Determination of Spoliation and Sanctions and Memorandum in Support Thereof (the "Motion"). [#97] The Motion was referred to this Court. [#98] This Court has carefully considered the Motion and related briefing, the case file, evidence and argument presented during the March 24, 2017, evidentiary hearing, and the applicable case law. For the following reasons, I **DENY** the Motion.

**I.     Background Facts[1]**

   **A. Robert Vallina's suicide and the weeks following that suicide**

Robert Vallina committed suicide while in the custody of the Teller County Sheriff's Office and its Detention Center at approximately 1:11 a.m. on September 2, 2014. Deputies were alerted to the suicide by another inmate. That inmate had called the control room and said that the Deputies needed to check on the inmate in the next cell (Cell A-13) because something was not right. When they arrived, Deputies found Mr. Vallina hanging by a bed sheet. Because the Deputies could not untie the bed sheet from Mr. Vallina's neck, Detective Christiansen cut the sheet so that they could lower Mr. Vallina.

Teller County Sheriff's Detective Dan Sloan investigated Mr. Vallina's death. Detective Sloan went to the Detention Center and was informed by guards that the death was an apparent suicide. Upon arriving at Cell A-13, Detective Sloan observed the sheet that Mr. Vallina had used to hang himself. Half of the sheet remained attached to the top bunk, while the second half was lying on the lower bunk's cot. Mr. Vallina was lying on the cell floor.

During the course of the investigation, Detective Sloan took several pictures of the cell. He verified that the cell door had been closed at the time of death and that no other individual had been in the cell. He observed an apparent suicide note. Based upon these factors, Detective Sloan's inspection of the cell's contents, and a review of the deputies' reports, Detective Sloan concluded that the death was a suicide. He then

---

[1] Most of these facts are drawn from the evidence presented at the evidentiary hearing. Others are drawn from exhibits submitted by the parties in their briefing on the Motion.

called out the coroner and told the coroner what he believed had happened. At that point, the coroner conducted an independent investigation.

Sometime between 4:00 a.m. and 7:00 a.m., Detective Sloan and a victim advocate went to Robert Vallina's parents' home. Detective Sloan spoke with Juan Vallina, Robert Vallina's father.[2] Detective Sloan told Juan Vallina that Robert Vallina had died, and likely told him that it was the result of a suicide. The possibility of a lawsuit was not discussed. Following this conversation, Detective Sloan spoke with the coroner and told the coroner that the only item that needed to be preserved from the cell was the suicide note. As a result, the bed sheet that Robert Vallina used to hang himself was discarded.

Later that day, the coroner visited Juan Vallina. By that time, he had also concluded that Robert Vallina's death was a suicide. He told Mr. Vallina that everything was normal with the autopsy and that the cause of death was strangulation. Juan Vallina spoke about Robert being a fisherman, and the coroner made a comment along the lines of "that may explain the intricate nature of the knot." Again, there was no discussion about the possibility of a lawsuit.

Approximately three days later, Marcello Porcelli, a former Lieutenant with the Teller County Sheriff's Office and former Public Information Officer, came to the Vallina house and met with Martha Vallina. Mr. Porcelli told Ms. Vallina that he had been contacted by the press and wanted Ms. Vallina to approve Mr. Porcelli's statement to the press. Mr. Porcelli further stated that the Colorado Mental Health Institute in Pueblo

---

[2] The victim advocate may have spoken to Martha Vallina, though there was conflicting testimony on that point. That conflicting testimony is immaterial to the Court's resolution of the instant Motion.

had informed the Sheriff's Office that Robert Vallina was sane and not a threat to anyone, and the Sheriff's Office relied upon those representations when it placed Mr. Vallina in the prison's general population.  In response, Ms. Vallina said that she did not blame Mr. Porcelli.

Over the next two weeks, Ms. Vallina became suspicious about Robert Vallina's death and whether the Sheriff's Office bore some responsibility.  During that timeframe, she had a call with the Undersheriff.  She told the Undersheriff that she wanted to put some money on the books of the inmate who had alerted the Deputies to Robert Vallina's suicide.  Ms. Vallina initially testified that she told the Undersheriff that the family was looking into legal action, but later stated that she was not sure that she did make such a statement.

Also during these first two weeks, Ms. Vallina went to the Sheriff's Office to try to obtain medical records and reports of the incident.  She met with a secretary.  The secretary informed Ms. Vallina that she could not have the medical records, though the rationale for not providing the medical records was somewhat unclear as there was some testimony that the Sheriff's Office did not have the medical records.

On September 11, 2014, an article ran in the Mountain Jackpot News with the headline "Investigation Continues Into Teller County Jail Death" and a subhead entitled "Mental Health System in Question."  Robert Vallina's sister, Heather Vallina, was interviewed for the article.  She is quoted as saying: "I understand [the Sheriff's Office's] stance, but just feel this shouldn't have happened.  There was a history here."  Heather Vallina also states that she does not believe that the jails are equipped to handle inmates with serious mental health issues.

In addition to speaking with the Mountain Jackpot News, Heather Vallina also contacted Channel 11 News in Colorado Springs. Channel 11 began investigating Mr. Vallina's death. Channel 11 interviewed the Undersheriff and sought medical records. Despite having signed releases, the Undersheriff apparently did not provide Channel 11 with the medical records.

### B. The legal proceedings

On January 2, 2015, Sergeant Sandefur of the Sheriff's Office was advised to open an internal affairs investigation into the death of Robert Vallina. On February 21, 2015, Plaintiffs' counsel sent a notice of claim to Sheriff Ensminger, the Board of County Commissioners for Teller County, and to the Attorney General for the State of Colorado. Plaintiffs filed the instant suit on August 20, 2015. [#1]

### C. The alleged spoliation

Plaintiffs' Motion alleges that several pieces of evidence were either destroyed or not preserved. First, the Motion alleges that Detective Sloan should have preserved the sheet that Robert Vallina used to hang himself. [#96 at 11] Plaintiffs allege that preservation of the sheet could have shown the "intricate" nature of the knot. The intricate nature of the knot could demonstrate that Plaintiff had spent significant time preparing the knot. This fact, Plaintiffs argue, would undercut Defendants' argument that Deputies had conducted an adequate cell check approximately one hour before Robert Vallina hung himself.

Second, the Motion alleges that the Defendants should have preserved a jail video from the date in question. [*Id.* at 5-7] This video was not a video of the jail cell, but instead showed the common area outside Cell A-13. Plaintiffs allege that the video

5

would have shown whether the Deputies conducted an adequate cell check prior to Mr. Vallina's suicide. Plaintiffs also maintain that the video could have confirmed or contradicted Deputy Christiansen's deposition testimony that he believed Mr. Vallina was standing at the door of his cell during the cell check. Detective Sloan testified that he did not review the video because he did not believe he needed to do so in order to complete the investigation; the Deputies had already informed Detective Sloan that nobody had been in the common area after lockdown. The undisputed evidence is that the video was automatically overwritten thirty days after Mr. Vallina's death.

Third, the Motion alleges that Defendants should have preserved data from the Automatic External Defibrillator ("AED") used in the attempt to resuscitate Mr. Vallina. [*Id.* at 11-13] The operating manual for the AED used by the Deputies shows that the AED retains certain data, including heart rhythms once the AED pads are applied. According to the Motion, "[t]his information would be relevant in determining how long Robert Vallina had been dead when officers attempted to resuscitate him." [*Id.* at 12-13] When deposed on July 19, 2016, Sheriff Ensminger stated that he did not know that the AED kept such data. The Sheriff's Office ordered the part necessary to obtain this data, but because of the delay between the death and the ordering of the part, no data could be extracted from the AED.

Finally, the Motion seeks "missing incident reports." [*Id.* at 9] From June 26, 2014, through June 29, 2014, Robert Vallina was held in Holding Cell 1. Teller County Sheriff's Jail Commander Jennifer Graumann testified about the four holding cells used by the Sheriff's Office. These holding cells are where inmates are first booked in. They are also used when an inmate needs to be separated from the general population.

Thus, an inmate can be placed in one of these holding cells if he has been in a fight or is otherwise subjected to discipline, has had a medical issue, is on suicide watch, needs to meet with an attorney or a deputy, or feels unsafe and needs to be placed in protective custody.

Generally an inmate on suicide watch will be placed in Holding Cell 4, but the other holding cells could be used if another inmate was in Holding Cell 4. If an inmate is placed in a holding cell for medical or suicidal issues, a form will be completed that goes into the inmate's medical records. Correctional Health Partners ("CHP"), the company that handles medical issues for the Detention Facility, maintains control of the medical records. If an inmate is placed in a holding cell for disciplinary reasons, a Deputy completes a disciplinary form and places the form in the inmate's disciplinary file.

Plaintiffs argue that Commander Graumann's testimony demonstrates that the Defendants destroyed incident reports from June 2014. If Robert Vallina had been in Holding Cell 1 for disciplinary reasons, a disciplinary report should have been completed and placed in his inmate file. If, on the other hand, Mr. Vallina had been in Holding Cell 1 for medical reasons or because he was on suicide watch, a medical report should have been completed and placed in his inmate file. Yet, Defendants failed to produce any reports detailing why Mr. Vallina was placed in Holding Cell 1 in June 2014. Plaintiffs argue that these records are relevant because, had Mr. Vallina been placed in Holding Cell 1 as a result of a suicide watch, that fact would have put Defendants on notice of Mr. Vallina's suicidal tendencies.

In response, Defendants relied on the testimony of LPN Sue Campbell. Nurse Campbell testified about records related to Mr. Vallina's housing in Holding Cell 1.

According to Nurse Campbell, CHP nurses check on inmates in the holding cells twice a day. A Segregation/Security Log from June 26 and June 27, 2014, shows that a CHP nurse performed such checks on Mr. Vallina. Nurse Campbell testified that the Segregation/Security Log is not used for inmates who are placed in the holding cell as a result of a suicide watch. Rather, a different form is used for those inmates. Based upon the use of the Segregation/Security Log, Nurse Campbell opined that Mr. Vallina was not in Holding Cell 1 as a result of a suicide watch.

In their Motion, Plaintiffs seek an adverse inference jury instruction as well as attorneys' fees and costs incurred in filing the Motion. [#96 at 1]

## II.     Analysis

"Destruction of evidence, or spoliation, is a discovery offense." *Gates Rubber Co. v. Bando Chem. Indus. Ltd.*, 167 F.R.D. 90, 101 (D. Colo. 1996). As part of their discovery obligation, "litigants have a duty to preserve documents that may be relevant to pending or imminent litigation." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007). "Once it is established that a party's duty to preserve has been triggered, the inquiry into whether a party has honored its obligation to preserve evidence turns on reasonableness, which must be considered in the context of whether 'what was done—or not done—was *proportional* to that case and consistent with clearly established applicable standards.'" *Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1164 (D. Colo. 2015) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010)).

A court may impose sanctions for the destruction or loss of evidence. *See Cache La Poudre Feeds, LLC,* 244 F.R.D. at 620. "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because [they] knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007). The two most important factors in determining spoliation sanctions are culpability of the offending party and actual prejudice to the other party. *See Browder v. City of Albuquerque*, 187 F. Supp. 3d 1288, 1297 (D.N.M. 2016); *HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2010 WL 4792388, at *2 (D. Kan. Nov. 17, 2010). To obtain an adverse inference instruction, the party claiming prejudice must also prove bad faith. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009); Fed. R. Civ. P. 37(e) (with respect to electronically stored information, court may give adverse inference instruction only "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation").

### A. Was the duty to preserve triggered?

The first question the Court must answer is whether the duty to preserve was triggered. In making this determination, the Court must conclude whether litigation was imminent. Undoubtedly, the filing of a lawsuit triggers a duty to preserve. *See Cache La Poudre Feeds, LLC,* 244 F.R.D. at 621. But, "the obligation to preserve evidence may arise even earlier if a party has notice that future litigation is likely." *Id.* As a result, "a party should not be permitted to destroy potential evidence after receiving unequivocal notice of impending litigation." *Id.* Nonetheless, "the duty to preserve

9

relevant documents should require more than a mere possibility of litigation." *Id.* "Ultimately, the court's decision must be guided by the facts of each case." *Id.*

Certainly, Plaintiffs' February 21, 2015, Notice of Claim triggered the duty to preserve. *See Montoya v. Newman*, 12-cv-02362-REB-KLM, 2015 WL 4095512, at *4-6 (D. Colo. July 7, 2015) (notice of intent to sue pursuant to Colorado Government Immunity Act triggered duty to preserve). By that point, however, the noose and video (and possibly the AED data) had already been destroyed; the noose was destroyed on the day of the incident and the video was overwritten within thirty days of the incident. As a result, the Court must determine whether other factors put Defendants on notice that litigation was likely. While this case presents a close call, the Court concludes that the Plaintiffs have met their burden of establishing a duty to preserve.

Initially, the nature of the incident lends support for finding a duty to preserve. This case involves a mentally ill individual who hung himself inside a jail cell. The serious nature of the incident certainly provided Defendants with some notice that litigation was possible.

In addition, within two weeks of the incident, Martha Vallina began inquiring about her son's death. Moreover, Heather Vallina was quoted in a newspaper article as saying: "I understand [the Sheriff's Office's] stance, but just feel this shouldn't have happened. There was a history here." Sheriff Ensminger was quoted in that same article. Finally, a television news station began questioning the Defendants about the incident, and provided them with signed medical waivers to collect information relevant to its investigation of the suicide. Given these facts, the Court concludes that the Defendants had notice that future litigation was likely.

### B. Actual Prejudice

Having concluded that Defendants had a duty to preserve evidence that was lost or destroyed, the Court must next determine whether Plaintiffs were prejudiced by the loss of evidence. With respect to the noose, Plaintiffs have not demonstrated any prejudice. Plaintiffs argue that a preserved noose could have demonstrated the intricacy of the knot. But, Plaintiffs have photographs of the noose and how it was tied to the bunk. Even if Defendants had preserved the noose, they would have needed to untie it from Mr. Vallina and the bunk. Thus, the preserved noose would necessarily have been preserved without the knot. Accordingly, Plaintiffs have not demonstrated any prejudice with respect to the noose.

Similarly, with respect to the AED data, Plaintiffs have not demonstrated any prejudice. Plaintiffs argue that this data would have shown the rhythm of Mr. Vallina's heart when the pads were applied, and thus may be "relevant in determining how long Robert Vallina had been dead when officers attempted to resuscitate him." [#96 at 12-13] Plaintiffs do not provide any evidentiary support for this assertion, however, and it is far from clear based on the evidence presented that this AED data could give any insight into how long Mr. Vallina had been dead. The Court finds Plaintiffs' allegations of prejudice with respect to the AED data are too speculative to justify a sanction. *See Zbylski*, 154 F. Supp. 3d at 1171 ("The prejudice must be actual, rather than merely theoretical.").

With respect to the video, the Court finds that Plaintiffs have demonstrated some prejudice, albeit limited. Again, the video showed the common area, not the inside of the cell. Nonetheless, had the video been preserved, Plaintiffs could have observed the

11

cell check that had occurred an hour earlier. Their inability to view this evidence and present it to the jury does provide some prejudice to Plaintiffs' argument that the cell check was inadequate.

Nonetheless, the prejudice is limited by the other evidence that exists regarding the cell check. Deputy Amy Isham testified about the cell check that was performed that evening. She performed the cell check with Deputy Christiansen. She said that the cell check of the entire A pod lasted about one and a half minutes. She checked the upper pods and Deputy Christiansen did the lower pods, which included Cell A-13. Because this was Deputy Isham's first cell check, Deputy Christiansen told her what she needed to do: pull on the door, look in, and make sure the person is alive and breathing. Thus, to the extent Plaintiffs are arguing that the cell check was not a lengthy check that would have entailed a sheet inspection (to insure the sheet was not being converted into a noose), Deputy Isham's testimony appears to confirm Plaintiffs' contentions. Thus, any prejudice from the loss of the video is limited.

Finally, with respect to the "missing incident reports," the Court finds that the Plaintiffs failed to meet their burden that such incident reports even existed, let alone that they were destroyed. Plaintiffs speculate that there must have been reports since reports are supposed to be created any time somebody is placed in a holding cell as a result of a medical or disciplinary incident. But, there are other explanations for the lack of such reports. First, Commander Graumann testified that somebody could be placed in a holding cell as a form of protective custody. Such protective custody placement would not appear to require either a disciplinary or medical report. Second, it is entirely possible that a report should have been created, but somebody made a mistake.

Either of these explanations is far more likely than the conspiracy theory that Plaintiffs would require this Court to accept. Plaintiffs' argument would require this Court to accept that somebody intentionally destroyed a report created months before the incident occurred. Plaintiffs speculate that this report would have shown that Plaintiff was on suicide watch. But, the undisputed testimony demonstrated that any suicide watch reports would have been kept by CHP, which is not a party to the lawsuit. Thus, to accept Plaintiffs' theory, the Court would need to conclude that a CHP employee would have destroyed the report to protect one of the Defendants in this case. Without any evidence of such collusion, the Court is not able to make such a finding.

Indeed, the evidence presented strongly suggests that Robert Vallina was not in the holding cell as a result of a suicide watch. The Segregation/Security Log is created for inmates who are not in the holding cell as a result of a suicide watch or medical issue. As a result, an absence of reports likely demonstrates that Mr. Vallina was in the holding cell for some other reason, possibly disciplinary or as an attempt to place him in protective custody. Thus, because Plaintiffs' argument with respect to the incident reports is entirely speculative, the Court finds that they have not satisfied the prejudice prong with respect to such reports.

### C. Sanctions

Besides attorneys' fees, the only sanction sought by Plaintiffs is an adverse inference instruction. To obtain such an instruction, however, the party claiming prejudice must also prove bad faith. *Turner*, 563 F.3d at 1149; Rule 37(e) (with respect to electronically stored information, court may give adverse inference instruction only

13

"upon finding that the party acted with the intent to deprive another party of the information's use in the litigation"). Here, Plaintiffs have not made such a showing.

The relevance of each of the destroyed items was, at best, speculative at the time of the evidence's destruction. Detective Sloan had determined that the death was a suicide, and did not believe that the noose needed to be maintained. It is hard to believe that Detective Sloan could have anticipated that the noose could be relevant to show the intricacy of the knot in some future civil litigation, especially since the knot would have needed to have been undone prior to preservation.

Similarly, with respect to the AED data, it appears that the Defendants did not even realize that such data was collected, let alone that it needed to be preserved. Once Defendants learned that the data may have existed, they bought the necessary equipment to try to collect the data. The fact that this was not done earlier appears to be the result of ignorance, not bad faith.

Finally, with respect to the videos, the loss of the video appears to be the result of, at most, negligence. The videos were automatically overwritten within thirty days. Clearly, Defendants should have known that a video of the inside of the cell itself would have been relevant, and should have taken all efforts to preserve that video. But, a video of the hallway outside the cell may not have triggered the same relevance and preservation concerns, especially since there was no doubt that this was a suicide. As Detective Sloan testified, he knew that nobody else had entered the hallway, so he did not feel that he needed to review (or presumably take steps to preserve) the video.

Perhaps, Defendants should have anticipated that the quality of the cell checks would become an issue in a later civil lawsuit. They did not. At most, however, their

15

failure to make such a prediction and preserve the videos was negligent.  Negligence does not support a bad faith instruction.

The only remaining question is whether Plaintiffs should be awarded their costs in litigating this motion as a sanction.  Again, the two most important factors in determining spoliation sanctions are culpability of the offending party and actual prejudice to the other party.  *See Browder*, 187 F. Supp. 3d at 1297; *HR Tech., Inc.*, 2010 WL 4792388, at *2.  As detailed above, the Court finds that, at most, Defendants were negligent with respect to one piece of evidence.  The actual prejudice from the loss of that piece of evidence was minimal.  As a result, the Court declines to award attorneys' fees.

Thus, for the reasons stated above, it is **ORDERED** that Plaintiff's Motion [#97] is **DENIED.**

DATED:  March 28, 2017                                      BY THE COURT:

                                                       s/Scott T. Varholak
                                                       United States Magistrate Judge